ANNE MARIE MURPHY (SBN 202540)
amurphy@cpmlegal.com
BLAIR KITTLE (SBN 336337)
bkittle@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, California 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

THERESA E. VITALE (SBN 333993)
tvitale@cpmlegal.com
**COTCHETT, PITRE & McCARTHY LLP**
2716 Ocean Park Boulevard, Suite 3088
Santa Monica, CA 90405
Telephone: (310) 392-2008
Facsimile: (310) 392-0111

*Attorneys for Plaintiff*
*and Guardian ad litem*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RUTH ROOTENBERG**, individually and through proposed court-appointed *Guardian ad litem*,<br><br>**Plaintiff,**<br><br>v.<br><br>**CHARLES SCHWAB & CO., INC.** a Delaware Corporation and **CHARLES SCHWAB BANK, SSB**, a Texas-chartered state savings bank, inclusive,<br><br>**Defendants.** | CASE NO.: 2:24-cv-007645<br><br>**COMPLAINT**<br>1. **Violation of The Elder Abuse and Dependent Adult Civil Protection Act (Cal. Welf. & Inst. Code § 15600, et seq.)**<br>2. **Violation of California's Unfair Competition Law (Bus. & Prof Code § 17200)** |

## TABLE OF CONTENTS

I.    INTRODUCTION....................................................................................... 1

II.   JURISDICTION AND VENUE................................................................ 2

III.  PARTIES .................................................................................................. 3

IV.   BACKGROUND ON FINANCIAL EXPLOITATION OF ELDERS
      AND SCHWAB'S KNOWLEDGE OF THE PROBLEM ........................ 3

V.    FACTUAL ALLEGATIONS ................................................................... 6

      A.  Schwab's Material Contribution to the Scammer's Scheme................ 6

      B.  Defendants Knew that Plaintiff Was the Victim of Financial Abuse ............... 14

      C.  Schwab Violated Its Own Guidance to Alert Trusted Representatives When it
          Suspected Fraud.............................................................................. 16

      D.  Defendants Knew Their Actions Were Likely to be Harmful to Plaintiff........ 17

      E.  Defendants Knew Plaintiff's Banking and Investment Activity Mirrored the
          Hallmark Signs of Financial Elder Abuse ................................................. 18

      F.  Plaintiff Has Suffered Emotional and Mental Harm Due to Defendants'
          Financial Elder Abuse................................................................... 20

VI.   CLAIMS.................................................................................................. 21

      FIRST CLAIM OF RELIEF
      Violation of The Elder Abuse and Dependent Adult Civil Protection Act
      Cal. Welf. & Inst. Code § 15600, et seq. (Against all Defendants) ................... 21

      SECOND CLAIM OF RELIEF
      Violation of California's Unfair Competition Law
      Bus. & Prof Code § 17200 (Against all Defendants) ......................................... 23

VII.  PRAYER FOR RELIEF.......................................................................... 24

VIII. DEMAND FOR JURY TRIAL................................................................ 25

Plaintiff RUTH ROOTENBERG, individually and through her *Guardian ad litem*, ("Plaintiff") brings this action for damages against Defendants **CHARLES SCHWAB & CO. INC.** and **CHARLES SCHWAB BANK, SSB** (collectively "Defendants" or "Schwab"). Plaintiff makes the following allegations based upon information and belief.

## I.    INTRODUCTION

1.    Plaintiff Ruth Rootenberg, now a 92-year-old woman, fell victim to a government impersonation scam from February to April of 2024 resulting in the theft of **over a quarter of a million dollars**.

2.    Without question, the evildoers are the unknown criminals who orchestrated the elaborate scheme to convince Ms. Rootenberg that her identity was stolen and that someone from the government was going to help her. The crime, however, depended on the aid and material contribution provided by CHARLES SCHWAB & CO. INC and CHARLES SCHWAB BANK, SSB. As part of the scam, Ms. Rootenberg purchased gold from companies that a Schwab investigator admittedly knew to be tied to prior scams. Video camera caught a frail Ms. Rootenberg get out of her mobility device, and unsteadily leave her senior home to hand gold to a runner for the scam enterprise in the street:



 

*Ms. Rootenberg handing over gold to the scammers*

3.      This case shines a light on the devastating impact of scams on our Nation's elders – financial institutions, like Schwab, need to protect elderly customers when, as here, they know their customer is being scammed. This case involves more than just red flags – here, Ms. Rootenberg reported a suspected hack before she lost money from her Schwab accounts – further, Ms. Rootenberg's daughter (who was a designated contact on the Schwab accounts) begged Schwab to do something because of suspicious circumstances. Schwab repeatedly blocked and unblocked Ms. Rootenberg's accounts while allowing her life savings to slip out of the Schwab accounts.

4.      In addition to actual knowledge that their customer was being scammed, the Schwab entities were privy to numerous red flags in Ms. Rootenberg's Schwab checking account and two brokerage accounts. Red flags included out of character transactions (in size and frequency), large influxes of money to the Schwab accounts (as the scammers drained Ms. Rootenberg's non-Schwab accounts), constant moving of money between Schwab accounts, and wires out of the accounts, including to  companies that Schwab admittedly knows had been associated with scams of other customers in the past.

## II.      <u>JURISDICTION AND VENUE</u>

5.      Plaintiff asserts that subject matter jurisdiction over Plaintiff's claims is proper pursuant to 28 U.S.C. § 1332(a) because Plaintiff is a citizen of a different

State from all Defendants, and Plaintiff asserts claims where the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6.      Plaintiff is a citizen and resident of the State of California, Defendant Charles Schwab & Co., Inc. is a Delaware corporation, Charles Schwab Bank SSB is a Texas -chartered state savings bank and each Defendant conducts business in California.

7.      Venue is proper in this judicial district pursuant to 28 U.S. Code § 1391 because Defendants' unlawful actions and omissions, as set forth herein, occurred in California, in Los Angeles County.

## III.    PARTIES

8.      At all relevant times, Plaintiff Ruth Rootenberg was a resident of the State of California, County of Los Angeles. At the time of the transactions at issue, Plaintiff was 91 years of age and an "elder" as that term is defined by Welfare & Institutions Code § 15610.27

9.      Defendant Charles Schwab & Co., Inc. is a multinational financial services company and holds $8.5 billion in client assets.[1] Charles Schwab & Co., Inc. is incorporated in the state of Texas and does significant business in California, having been founded here.

10.     Defendant Charles Schwab Bank, SSB is a Texas-based state savings bank and is the banking subsidiary of the Charles Schwab Corporation.

## IV.    BACKGROUND ON FINANCIAL EXPLOITATION OF ELDERS AND SCHWAB'S KNOWLEDGE OF THE PROBLEM

11.     Schwab has long understood these types of schemes and allegedly has policies in place to try to prevent them. In 2018, Schwab posted a video through its Advisor Services site that taught its advisors and their affiliates that the regulations in place are largely insufficient and that financial institutions should have more

---

[1] https://pressroom.aboutschwab.com/press-releases/press-release/2024/Schwab-Reports-Fourth-Quarter-and-Full-Year-Results/default.aspx

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

robust and uniform escalation policies in place to try to stop financial abuse.[2] At one point, the elder law expert says, "the regulators encourage you to try to get a trusted contact in every client file. We think that is not enough to actually make this happen. You need to insist on it and to get more than one trusted contact. […] These rules are not going to protect aging persons from abuse, but they are better than no rules. At least you can't get chastised or sued if you make the effort to report these problems."[3] Looking at Schwab's account agreements, it is unclear what, if any, policy Schwab follows to prevent the financial exploitation of elders, despite advising their affiliates to do more over five years ago.



---

[2] https://advisorservices.schwab.com/content/protecting-senior-and-vulnerable-investors

[3] *Id.* (emphasis added)

12.     Despite acknowledging the risk of elder scams and attempting to educate its advisors, between February to April of 2024, Schwab materially contributed to the defrauding of then 91-year-old Plaintiff Ruth Rootenberg of over $278,000. Shockingly, Schwab approved hundreds of thousands of dollars in transactions, including physical gold purchases from a gold company that Schwab's own supervisor knew to be involved in scams in the past.

13.     More than a quarter-million dollars that Ms. Rootenberg and her family had saved had vanished in less than four months due to Defendants' blatant violations of California's Elder Abuse and Dependent Adult Civil Protection Act.

14.     Elder financial abuse, has become as ubiquitous as it is pernicious. Older adults are preferred targets for financial exploitation due to their income and accumulated life-long savings and thus scams targeting their savings have proliferated over the last decade.

15.     Often called the "crime of the 21st Century," elder financial abuse is epidemic, with estimates of the annual economic losses as high as $37 billion per year.[4] Those monetary loss estimates, however, do not include the often severe mental and/or physical impacts of financial abuse upon the health and well-being of elderly victims. For example, one of the documented impacts of elder abuse is earlier morbidity, with victims being three times more likely to die early than similarly situated non-victims.

16.     Schwab representatives— along with the financial institutions' inadequate policies, procedures and controls — failed to protect Ms. Rootenberg, a loyal and vulnerable customer, when they wired more than a quarter of a million

---

[4] AARP & Princeton Survey Research Associates, AARP Research, Consumer Behavior, Experiences and Attitudes: A Comparison by Age Groups (March 1999), available at Consumer Behavior, Experiences and Attitudes: A Comparison by Age Groups (aarp.org)

dollars from her Schwab accounts ("Plaintiff's Schwab accounts") on three (3) occasions,[5] without performing sufficient risk assessment.

17.    As a brokerage, Schwab is regulated by the Financial Industry Regulatory Authority ("FINRA"), which has rules specifically related to protecting elders from financial exploitation. FINRA Rule 2165 explicitly permits brokerages like Schwab to place a temporary hold on a disbursement of funds for customers aged 65 and older if the brokerage believes that financial exploitation of that customer "has occurred, is occurring, has been attempted, or will be attempted."[6] FINRA requires that brokerages that elect to follow this rule have "written supervisory procedures" to implement this goal. Therefore, throughout its interactions with Ms. Rootenberg, Schwab was operating on its own specific policies regarding the protection of vulnerable adults from financial exploitation.

## V.    FACTUAL ALLEGATIONS

### A.    Schwab's Material Contribution to the Scammer's Scheme

18.    In January of 2024, Ms. Rootenberg reported to Schwab that her computer and account had been hacked. She had noticed "clicking" sounds and was suspicious someone was watching her on her computer, including as she accessed her Schwab and other financial accounts. At this time, Schwab, as a sophisticated financial institution, should have taken action to freeze Ms. Rootenberg's accounts and should have reached out to Ms. Rootenberg's family / trusted contacts.

---

[5] There were another two wires, but those were recalled.
[6] https://www.finra.org/rules-guidance/rulebooks/finra-rules/2165

19.  In late January 2024, scammers posed as federal agents contacting Ms. Rootenberg because her identity had supposedly been stolen. She was told to sign an



online document and give the scammers remote access to her computer while she logged onto her Schwab and other financial institution accounts. Every day she would receive two calls asking her to log into her accounts and direct her money to different transactions, which were processed by Schwab. The scammers would monitor Ms. Rootenberg's activity and send her messages directing her what to say to financial institution representatives.

20.  Instead of taking basic steps to protect Ms. Rootenberg, on February 1, 2024, Schwab allowed their 91-year-old customer, fresh off reporting that her account and computer were hacked, to engage in a series of transactions that should have set off alarm bells. With the assistance of Schwab, Ms. Rootenberg sold 54 individual stocks in a single day, totaling $17,000. That same day, $33,000 was transferred from her living trust brokerage account at Schwab to her checking account at Schwab, $13,700 was transferred from her designated beneficiary account at Schwab into her checking account at Schwab, and $95,400 was transferred from her checking account at Schwab into her living trust brokerage account at Schwab, **leaving only $91.16 in her Schwab checking account** (the account she used to pay

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

for her senior living home). Any banker paying attention would have known these transactions to be part of a scam. Unexplained, unusual, and rapid movement of money between accounts is a hallmark sign of fraud. Schwab knew that Ms. Rootenberg generally transacted less than a few hundred dollars a day – Ms. Rootenberg would have been saved from the massive financial and emotional toll she suffers today if Schwab had taken basic steps.

21.    Making matters so much worse, the very next day, on February 2, 2024, Schwab facilitated a $132,281.52 fraudulent wire for Ms. Rootenerg to buy gold for the scammers from the Bullion Exchange, LLC, a company that Matt Morrell, a supervisor at Schwab's Fraud Investigations team, knew was affiliated with other scams. Schwab did not verify this transaction with Ms. Rootenberg, nor did it confirm the transaction with Ms. Rootenberg's daughter, Lesley Joelson ("Ms. Joelson"), a trusted contact on her mother's account. Earlier that day, $46,000 had been moved from one Schwab account to another. Despite knowledge that the transactions presented red flags, Schwab failed to use the system it had set in place to alert its customers and their representatives of potential fraud.

22.    A week later, on February 9, 2024, there were more transfers orchestrated by the scammers— $70,000 was moved from one Schwab account to another and then Schwab facilitated an outbound wire of $65,713.09 from Ms. Rootenberg's living trust account to Bullion Exchange, LLC for purchasing gold for the scammers.

23.    On March 14, 2024, Schwab claims it engaged its Senior and Vulnerable Investors Investigations ("SVI") team because it was told of a suspicious email. A hold was placed on Ms. Rootenberg's account, and Schwab reached out to Ms. Joelson for the first time. Ms. Joelson clearly instructed Schwab to lock the account, because her mother had shared with Ms. Joelson that she "was not allowed to tell anyone what was going on" - a hallmark sign of financial exploitation.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Despite this instruction and knowledge, Schwab refused to lock the account. The scam continued.

24.     On March 19, 2024 there were two incoming wires to Ms. Rootenberg's Schwab checking account, one for $49,000 and one for $49,500 – both orchestrated by the scammers. (Incoming wires are also a hallmark of elder scams and are the result of the scammers instructing their victims to move money strategically into their hands—scammers consider which financial institutions will be most likely to let them get the money out of the institution and into their hands).

25.     Three days later, on March 21, 2024 there was another incoming wire to Ms. Rootenberg's Schwab checking account, this time for $30,000. The March 19 and March 21 wires were the scammers bleeding Ms. Rootenberg's Capital One savings account dry and consolidating money to transfer out of Schwab.

26.     Plaintiff understands that there was some type of block on the Schwab accounts for part of March, but the block was removed on March 22, 2022. Right away there was more activity. Kensi Tracy, with Schwab's Senior & Vulnerable Investors Investigations team ("SVI") finally called Ms. Joelson to report a suspicious large wire – Ms. Joelson recommended that Schwab close the account and told Ms. Tracy that something bad was going on – Ms. Tracy didn't want to block the account.

27.     While Schwab should have been on alert, on March 27, 2024 $120,000 was moved from Ms. Rooterberg's living trust account at Schwab to her Schwab checking account while scammers prepared their next transfer for $130,348.56. This outbound wire was only recalled after Ms. Rootenberg claimed the investment opportunity went away. When Ms. Joelson pleaded with Schwab to lock the account, Schwab representative Kensi Tracy told Ms. Joelson that Schwab could not lock the account until Ms. Rootenberg admitted that she was being defrauded. The refusal to lock the account occurred despite Schwab's website acknowledging that "[v]ictims

may be reluctant to tell someone what is happening due to embarrassment or fear of straining a relationship."[7]

28.    With an overseas family trip looming, Ms. Joelson reached back out to Schwab and asked Ms. Tracy to again lock her mother's accounts at Schwab because she thought her mother was being scammed. Ms. Tracy refused arguing that Ms. Rootenberg was in control and she felt comfortable with what she was doing. (In actuality Ms. Rootenberg was under so much stress and strain from the situation that she needed medical attention and was prescribed medication for anxiety, insomnia and IBS.)

29.    As is typical with scam victims, Ms. Rootenberg was coached to tell no one what was going on (again, Schwab knows that victims will be reluctant to say what is going on).

30.    Instead of blocking the accounts, Schwab instead added Ms. Joelson as a Limited Trading Authority ("LTA") on Ms. Rootenberg's account, with her consent. Adding the LTA was a ploy to appear to do something, however, it was not going to help stop Ms. Rootenberg from being scammed; only Schwab was in a position to do that by locking the accounts.

31.    Another $138,632.79 wire was attempted on April 5. It was also recalled, not at the behest of Schwab's SVI team, but again because Ms. Rootenberg (at the scammers direction) told Schwab the investment opportunity went away.

32.    The scammers continued to bleed Ms. Rootenberg of her retirement savings in April. On April 8 they had her sell her investments at another brokerage firm (Fidelity) and transfer the proceeds to Schwab. On April 10, 2024 $18,000 was wired from Fidelity to Ms. Rootenberg's Schwab checking account. The next day $21,000 was transferred from the checking account to the Schwab living trust account. Also on April 11, $70,000 was transferred from Ms. Rootenberg's Fidelity

---

[7] https://www.schwab.com/schwabsafe/protecting-senior-investors (last accessed 8/14/24)

**COMPLAINT**

account to her Schwab checking account. The full $70,000 was transferred the same day to the Schwab living trust brokerage account (again leaving too little to pay rent).

33.    On April 16, Schwab sent a $78,475.32 wire to Neptune Global Bullion Exchange from Ms. Rootenberg's living trust account. Schwab again alerted no one. The scammers directed Ms. Rootenberg to purchase a video camera so that they could watch her unbox the gold she purchased and so they could watch as she reboxed the gold to their specifications. Then on April 22, Ms. Rootenberg was instructed by the scammers to hand-deliver the physical gold to a runner outside of her retirement home (who was in fact working for the scammers).



*Ms. Rootenberg handing over gold to the scammers (caught on security cameras at her retirement community)*

34.    On April 25, Ms. Joelson called Schwab again to beg the institution to protect her mother and close the account. Schwab claims that an employee spoke to Ms. Rootenberg who claimed to be diversifying her portfolio and refused to give more information. Ms. Joelson told Schwab to ask her mother where the gold was.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Schwab's employee said "she was comfortable that Ruth knew where it was" – unfortunately it was in the hands of her scammers.

35.    Schwab also refused to more permanently lock Ms. Rootenberg's account even after wires were attempted and cancelled. Only after an attempt at a to send a wire transfer to a foreign unknown third party in Vietnam did Schwab at last take the threat seriously and locked the account.

36.    Without Schwab's decision to unblock Ms. Rootenberg's account and authorize each of these transactions, she would not have lost over a quarter of a million dollars. Schwab did not adequately investigate potential fraudulent transactions each of the five times it re-opened Ms. Rootenberg's account. Schwab materially contributed to the fraudulent scheme with its negligence.

37.    Suffice to say, this case presents obvious and extensive signs of a scam being perpetrated against a Schwab customer in her 90s. For context, in the entire month of December 2023, just before the scam started in 2024, Ms. Rootenberg's living trust account never traded more than $600 at a time. The individual transactions on Ms. Rootenberg's other accounts did not regularly exceed $10,000. By contrast, as the scam progressed, Ms. Rootenberg transferred, deposited, and wired hundreds of thousands of dollars across her Schwab accounts and to gold vendors.

38.    The sudden nature and magnitude of irregular activity on Ms. Rootenberg's account is an archetypal example of financial exploitation of an elder, as described by Schwab's own "Financial Exploitation of Older Adults: Prevention Checklist." By Schwab's own standards, Ms. Rootenberg's behavior exhibited tell-tale signs:

- "Sudden changes in bank accounts or banking practices […]
- New 'friends' or helpers attempting to isolate an older, vulnerable adult or limit contact with relatives or old friends. […]

- [U]nusual spending behavior, checks being written to cash or the unexplained disappearance of cash or property."[8]

39.    Any reasonable banker or broker would have their suspicions raised by the combination of these factors. The indignity of this initial failure is compounded by Schwab's investigations team further neglecting Ms. Rootenberg after she and her daughter both directly provided Schwab with information that she had been exploited.

40.    Between a disadvantaged elderly customer and the financial institutions entrusted to keep the customer's investments and savings safe, only the latter "first responder" is realistically positioned to prevent scams which are so obviously preying upon their elderly clientele. After all, there are three parties to a scam – the senior who does not want to lose their life savings but is being fooled, the scam artist who is a criminal, and the financial institution that facilitates the transaction. California law is very clear, institutions that "assist" in financial elder abuse are liable.

41.    In refusing to follow its own guidance around senior investors, Defendants knew or should have known that their actions were likely to be harmful to Ms. Rootenberg. The financial elder abuse that took place would not have occurred were it not for Defendants' actions in handing over "the keys to the kingdom."[9] In fact, due to Defendants' actions, Plaintiff has suffered irreparable financial loss and significant emotional distress. When an elder loses their life savings, it is like a nuclear bomb going off in their life. There is no prospect for a 92-year old woman, in failing health, with trouble hearing, and using a mobility device to return to the workplace and recover financially.

/././

/././

---

[8] https://www.schwab.com/schwabsafe/financial-exploitation-checklist (last accessed 9/5/2024)

[9] https://www.ncbi.nlm.nih.gov/books/NBK208555/ (last accessed 9/5/2024)

## B. Defendants Knew that Plaintiff Was the Victim of Financial Abuse

42.     At the time of the first unusual, suspicious transaction, Defendant Schwab knew that Plaintiff spent modestly, and did not regularly transfer large sums of money into or out of her Schwab checking, Designated Beneficiary, or Living Trust accounts.

43.     Schwab **unblocked** Ms. Rootenberg's Living Trust account **five different times** after identifying suspicious activity and over the objections of Ms. Joelson who served as both a representative and later an LTA on Ms. Rootenberg's accounts. The numerous red flags and Ms. Rootenberg and Ms. Joelson's warnings gave Schwab more than sufficient notice to know that they were facilitating and assisting financial abuse:

1. January 2024, Ms. Rootenberg contacts Schwab and informs them her computer appears to have been hacked.

2. March 14, 2024: Schwab reports in a letter that on March 14 Schwab learned that Ms. Rootenberg received a suspicious email. Five days later, two more large wires of nearly $50,000 were transferred into Ms. Rootenberg's checking account.

3. March 22, 2024: Schwab's Senior and Vulnerable Investors Investigations team contacted Ms. Joelson for the first time to report suspicious large wire transfers. These two transactions, $49,000 and $49,500, represent around half of the money that Ms. Rootenberg had already lost to scammers through physical gold purchases. Ms. Joelson asked for Schwab to close the account. Schwab refused.

4. Late March: Matt Morrell (unknown spelling), Schwab Fraud Investigations Supervisor, tells Mr. Joelson that he was aware the gold companies that Ms. Rootenberg was buying from were involved in other fraud cases.

5.  March 23, 2024: Schwab reports the situation to Adult Protective Services.

6.  April 4, 2024: Ms. Joelson again spoke with Schwab's Senior and Vulnerable Investors Investigations team to tell them she was certain that her mother was being scammed. Ms. Rootenberg's behavior exhibited the exact qualities that Schwab flags as indicators of financial exploitation.[10] Schwab claimed that its 91-year-old customer, who was prescribed medication for anxiety, insomnia, and stomach pain for all the stress she was under, was fully in control of her financial decisions. Schwab again refused to act.

7.  April 16, 2024: Schwab approves a $78,475.32 fraudulent wire transfer for gold.

8.  April 25, 2024: Ms. Joelson again reaches out to Schwab directly to report fraud on the account and request that an investigation be re-opened. Schwab claims that Ms. Rootenberg "knows where the gold is." A video shows that a scammer came to her retirement community to physically take it from her. Schwab still refused to lock the account.

9.  April 29, 2024: Kensi Tracy spoke with Leslie Joelson and informed her that Schwab may have to "exit Ruth as a customer due to liability" now that a second Schwab investigation had been opened on her account.

44.    At all times relevant to the Complaint, Plaintiff was over the age of 65, and residing in California as an "Elder," as defined by Cal.Welf. & Inst.Code § 15610.2.

45.    The activity related to this fraud occurred in February through May of 2024 and involved uncharacteristic activity on all three of Ms. Rootenberg's Schwab

---

[10] https://www.schwab.com/schwabsafe/financial-exploitation-checklist (last accessed 8/14/24)

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

accounts that was unusual and suspicious from the first transaction. The activity only became more unusual and suspicious with each subsequent fraudulent transaction and Schwab knew it was occurring and that it was assisting and facilitating these transactions.

### C. Schwab Violated Its Own Guidance to Alert Trusted Representatives When It Suspected Fraud

46.    At all relevant times, Defendants knew that elderly individuals are especially susceptible to financial fraud and that financial elder abuse accounts for tens of billions of dollars in losses each year according to the Consumer Financial Bureau, National Council on Aging, and the FBI Crime Complaint Center. As explained by Schwab on its website's "Financial Exploitation of Older Adults: Prevention Checklist"- page:

> "Financial fraud costs older adults at least $36 billion annually, according to the National Council on Aging."[11]

And on its "5 Tips for Talking to Your Parents About Their Finances" – page: "In 2021, the FBI's Internet Crime Complaint Center received a total of 847,376 complaints with reported losses of about $6.9 billion—approximately $1.7 billion of which were losses to victims over the age of 60.

> 'Generally speaking, older individuals aren't as savvy when it comes to modern technology, so they might not pick up on what seem like obvious scams,' [a Schwab senior wealth advisory specialist] says."[12]

47.    To assure customers that Schwab will protect them from popular fraudulent schemes, Schwab encourages customers to establish a Trusted Contact Person. It claims that when Schwab "suspects fraudulent or unusual activity on your account, the first course of action is to validate the transaction," which starts with

---

[11] https://www.schwab.com/schwabsafe/financial-exploitation-checklist (last accessed 8/12/2024)

[12] https://www.schwab.com/learn/story/5-tips-talking-to-aging-parents-about-their-finances (last accessed 8/12/2024)

contacting the customer, and then goes to their trusted contact.[13] Neither Ms. Rootenberg nor Ms. Joelson were contacted about fraudulent activity in February.

48.     Additionally, Schwab ignored Ms. Rootenberg's Trusted Contact Person, Ms. Joelson, when she repeatedly demanded that Schwab lock Ms. Rootenberg's accounts.

49.     Discovery will reveal Schwab's exact policies and procedures for investigating financial exploitation, including the procedures behind its SVI team. Schwab and its agents and representatives are and have been mandated reporters of suspected financial abuse of an elder, such as Plaintiff, as defined by the current version of Cal.Welf. & Inst.Code § 15630.2.

**D.  Defendants Knew Their Actions Were Likely to be Harmful to Plaintiff**

50.     In violation of their own obligations as mandatory reporters, Schwab representatives completed three large wire transfers from Plaintiff's account after watching Ms. Rootenberg uncharacteristically shift hundreds of thousands of dollars within and out of her Schwab portfolio.

51.     Indeed, by April 16, 2024, $276,469.93 had been wired out of Plaintiff's Schwab account thanks to the material contribution, facilitation and assistance of Schwab's agents and employees.

52.     Almost none of this investment activity, which was highly unusual for Plaintiff Ms. Rootenberg, was flagged, reported as suspicious, reported to the trusted contact person, or prevented by Schwab agents or representatives who approved or effectuated the wire transfers.

53.     Defendant knew that the activity constituted financial elder abuse, as defined and outlined in its own trainings. Defendant knew that by failing to follow its own guidance Plaintiff would be harmed.

---

[13] https://www.schwab.com/learn/story/why-you-should-establish-trusted-contacts (last accessed 8/12/2024)

LAW OFFICES
COTCHETT, PITRE & McCARTHY, LLP

54.   Due to Defendants' knowing material contribution to obvious financial fraud and repeated failures to fulfill its reporting duties, to follow its own policies, or to provide Plaintiff with the same protection it promises all of its customers, Plaintiff has lost almost all of her retirement savings which is approximately $277,000 dollars.

**E.  Defendants Knew Plaintiff's Banking and Investment Activity Mirrored the Hallmark Signs of Financial Elder Abuse**

55.   A decade ago, the Board of Governors of the Federal Reserve System and Consumer Financial Protection Bureau joined with six other federal agencies in issuing an "Interagency Guidance on Privacy Laws and Reporting Financial Abuse of Older Adults" ("Interagency Guidance") to financial institutions such as Defendant Schwab. The Interagency Guidance underscored what was then a well-known problem to Defendants and the rest of the financial community:

> Recent studies suggest that financial exploitation is the most common form of elder abuse . . . Older adults can become targets of financial exploitation by family members, caregivers, scam artists, financial advisers, home repair contractors, fiduciaries (such as agents under power of attorney and guardians), and others. Older adults are attractive targets because they may have significant assets or equity in their homes. They may be especially vulnerable due to isolation, cognitive decline, physical disability, health problems, and/or the recent loss of a partner, family member, or friend. **Financial institutions can play a key role in preventing and detecting elder financial exploitation. A financial institution's familiarity with older adults it encounters may enable it to spot irregular transactions, account activity, or behavior. Prompt reporting of suspected financial exploitation to adult protective services, law enforcement, and/or long term ombudsmen can trigger appropriate intervention, prevention of financial losses, and other remedies[14].** (emphasis added)

56.   Further, the Interagency Guidelines specifically identify the well-known hallmarks of financial abuse of older adults, including, but not limited to:

---

[14] https://www.sec.gov/news/press/2013/elder-abuse-guidance.pdf (last accessed 6/26/2024)

- Erratic or unusual banking transactions, or changes in banking patterns, such as:

  > Sudden non-sufficient fund activity

  > Uncharacteristic attempts to wire large sums of money.[15]

57.    The importance of the role of financial institutions in preventing and reporting financial elder abuse is likewise emphasized in the Consumer Financial Protection Bureau's "Reporting of Suspected Elder Financial Exploitation by Financial Institutions," which specifically clarifies that financial institutions may observe financial exploitation and may report such conduct without violating an older adult's privacy.[16]

58.    Starting with the January report of hacking and first wire transfer on February 2, 2024, Plaintiff's banking activity so clearly exhibited signs of elder financial abuse that there is no question Defendants knew and materially contributed to the abuse for the subsequent weeks until Plaintiff's life savings was depleted. At the very least, this knowledge was certain by March 14, when Schwab says it knew of a suspicious email, and beyond certain when Ms. Joelson directly told Schwab that her mother was being scammed.

59.    Schwab also knew that every fraudulent wire transfer made from Plaintiff's Schwab account exceeded the U.S. Department of Treasury's $10,000.00 threshold requiring the filing of a "Currency Transaction Report," (CTR) thereby invoking the scrutiny of Schwab's management. That scrutiny would have necessarily focused upon (and thereby informed Schwab's management of) the identity of the customer initiating the suspicious wire transfer, the amount of the suspicious transaction, and the identity of the recipients.

---

[15] https://www.sec.gov/news/press/2013/elder-abuse-guidance.pdf (last accessed 6/26/2024)

[16] https://files.consumerfinance.gov/f/documents/cfpb_suspected-elder-financial-exploitation-financial-institutions_report.pdf (last accessed 6/26/2024)

60.      Despite the fact that the very first wire transfer was for *thirteen times* the Department of Treasury's threshold, Schwab employees continued to knowingly and materially contribute to the blatant financial elder abuse, completing two more enormous transfers above the threshold without contacting Plaintiff's representative, Ms. Joelson.

**F.  Plaintiff Has Suffered Emotional and Mental Harm Due to Defendants' Financial Elder Abuse**

61.      Financial elder abuse causes irreparable harm to its elderly victims, as has occurred here. By the time the financial elder abuse is discovered by the victims, the original perpetrator has usually spent or otherwise siphoned off the elderly victims' assets. Efforts at restitution, therefore, are highly unlikely to yield any recovery of assets. The elderly victim often experiences a permanent decline in his or her standard of living. Many victims suffer even more from feelings of betrayal that typically accompany financial abuse.

62.      Prosecutors call financial exploitation of the elderly a "violent crime," not because of any physical force used by the wrongdoer, but because of its lethal effects. According to a leading resource on elder abuse, published for California Judicial Officers, the impacts of abuse include the following:

- Early morbidity for the elder, with the risk of death three (3) times higher than for non-victims;
- Significant health effects, including declining functional abilities; which often leads to progressive dependency, social isolation, a sense of helplessness, and a cycle of worsening stress and psychological decline.[17]

63.      In addition to the hundreds of thousands of dollars that Plaintiff lost due to Defendants' active participation in this scheme, upon learning of the scheme and about the role of the financial institution she formerly trusted, Plaintiff has suffered

---

[17] Elder Abuse Pocket Reference, A Medical/ Legal Resource for California Judicial Officers (Judicial Council of California, 2012) (last accessed 6/26/2024)

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

devastating mental and emotional harm, has lost sleep, and suffers from gastrointestinal problems, creating enormous strains in the last years of her life.

## VI.    <u>CLAIMS</u>

### FIRST CLAIM FOR RELIEF

### Violation of The Elder Abuse and Dependent Adult Civil Protection Act

### Cal. Welf. & Inst. Code § 15600, et seq.

### (Against all Defendants)

64.    Plaintiff incorporates by reference the allegations above as if they were set out in full herein.

65.    At all times herein mentioned, Plaintiff was an elder within the meaning of the California Welfare & Institutions Code and a resident of California. Defendants knew Plaintiff was an elder. Because of her age, Plaintiff was substantially more vulnerable to the deceptive taking from her retirement savings and assets.

66.    To comply with rules established by FINRA, Schwab strongly recommends to all customers, but especially seniors, that they set up a "trusted contact person."[18] It advertises that establishing this person can "help your financial firm move more quickly and decisively when addressing fraudulent activity."

67.    In its training, "Protecting Senior Investors," elder law experts recommended to Schwab advisors that they establish clear flags for diminished capacity and create a clear senior policy around potential fraudulent activity.[19]

68.    Furthermore, Defendants are mandated reporters of suspected financial abuse of an elder adult pursuant to Cal. Welf. & Inst. Code § 15630.1, were in direct

---

[18] FINRA Rule 4512, https://www.finra.org/rules-guidance/rulebooks/finra-rules/4512 (last accessed 8/14/24); Schwab, "Why You Should Establish Trusted Contacts," https://www.schwab.com/learn/story/why-you-should-establish-trusted-contacts (last accessed 8/14/24).

[19] Schwab, "Protecting Senior and Vulnerable Investors," (May 15, 2018) https://advisorservices.schwab.com/content/protecting-senior-and-vulnerable-investors (last accessed 8/14/24).

contact with Plaintiff, reviewed Plaintiff's financial documents, records, and transactions in connection with providing financial services to her, and who, within the scope of their professional practice, observed and understood that her sudden, suspicious, and highly unusual banking activity reasonably appeared to be financial abuse.

69.    Defendants observed and had actual knowledge of the behavior and of the unusual circumstances and of the transactions that would lead an individual with training or experience, based on the same facts, to know that Plaintiff was the victim of financial abuse of an elder.

70.    Defendants' policies, knowledge and expertise, and their failure to report, prevent, or delay the suspicious transfers of a quarter of a million dollars from Plaintiff's Schwab account, from February through May of 2024, constituted material contribution and assistance to the taking of funds from Plaintiff for a wrongful purpose with the intent to defraud.

71.    Defendants knew that their wrongful conduct was likely to be harmful to Plaintiff.

72.    By performing the acts set forth above, Defendants are liable for financial abuse of an elder.

73.    As a legal result of Defendants' conduct herein alleged, Plaintiff has suffered damages, including, without limitation, general and economic damages, in an amount according to proof at time of trial.

74.    The actions taken by Defendants set forth above were in all respects reckless, fraudulent, oppressive, and/or malicious, and manifested conscious disregard for the rights of Plaintiff. Plaintiff is therefore entitled to an award of exemplary and punitive damages pursuant to § 3294 of the California Civil Code, according to proof at trial.

75.    Plaintiff is entitled to reasonable attorney's fees and costs pursuant to Cal. Welf. & Inst. Code § 15657.5.

76.    Wherefore, Plaintiff prays for relief as set forth below.

## SECOND CLAIM FOR RELIEF

### Violation of California's Unfair Competition Law

### Bus. & Prof Code § 17200

### (Against all Defendants)

77.    Plaintiff incorporates by reference the allegations above as if they were set out in full herein.

78.    Defendants' conduct was unlawful, unfair, and/or fraudulent within the meaning of Business & Professions Code § 17200.

79.    Defendants' conduct was unlawful within the meaning of Business & Professions Code § 17200 in that, among other conduct and statutes, Defendants' conduct violated Cal. Welf. & Inst. Code § 15630.1 *et seq.,* as described in this Complaint.

80.    Among other things, Defendant's agents and representatives failed to protect Plaintiff, an elder within the meaning of the California Welfare & Institutions Code and a resident of California, from predatory elder financial abuse, by failing to follow its own fraud prevention, and protection policies and transferring a quarter of a million dollars of Plaintiff's funds via wire transfers, failing to report the transfers to Plaintiff's trusted contact and LTA, and failing to fulfill their own reporting requirements pursuant to Cal. Welf. & Inst. Code § 15630.1.

81.    Defendants' actions are part of a general business practice that was effectuated by several agents and representatives.

82.    By reason of the acts and conduct alleged herein, Plaintiff has suffered injury in fact.

83.    Defendants have derived economic benefit by failing to follow their fraud prevention and protection policies and materially contributing to the taking of Plaintiff's funds from her Schwab accounts. Plaintiff has a right to an order requiring Defendants to restore Plaintiff's money and interest which may have been

acquired by unfair, unlawful and/or fraudulent business practices, as well as the resulting general damages.

84.     Pursuant to Business & Professions Code § 17203, Plaintiff seeks from Defendants restitution of all earnings, profits, compensation and benefit it obtained from Plaintiff, as a result of its conduct in violation of Business & Professions Code §§ 17200 *et seq.,* as described herein.

85.     Plaintiff further seeks injunctive relief preventing Defendants from collecting on any outstanding debts owed by Plaintiff to Defendants.

86.     Wherefore, Plaintiff prays for relief as set forth below.

## VII.    PRAYER FOR RELIEF

1.     Injunctive relief to prevent Defendants from collecting from Plaintiff any outstanding debts;

2.     Compensatory damages in an amount according to proof at trial;

3.     Special and general damages in an amount according to proof;

4.     Restitution in an amount according to proof;

5.     Exemplary and punitive damages according to proof;

6.     Costs of suit herein incurred;

7.     Pre- and post-judgment interest at the maximum legal rate:

8.     For attorneys' fees pursuant to Welfare & Institutions Code §15600 *et seq.*; and,

9.     For such other relief as the Court may deem just and proper.

/././

/././

/././

/././

/././

/././

/././

1  **VIII.    DEMAND FOR JURY TRIAL**

2         Plaintiff demands trial by jury on all issues so triable.

3  Dated: September 6, 2024           **COTCHETT, PITRE & McCARTHY, LLP**

4

5                                     By: _____

6                                          **ANNE MARIE MURPHY**
                                           **BLAIR V. KITTLE**
7                                          **THERESA E. VITALE**

8                                     *Attorneys for Plaintiff and Guardian ad Litem*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**                                                    **25**